834 F.2d 1075
 24 Fed. R. Evid. Serv. 206
 Joseph CATULLO, etc., Plaintiff, Appellee,
v.
Sidney S. METZNER, et al., Defendants, Appellees.
Appeal of Philip E. ROBERTS and Harry A. Ezratty.
Joseph CATULLO, etc., Plaintiff, Appellee,
v.
Sidney S. METZNER, et al., Defendants, Appellees.
Conservit, Inc., Defendant, Appellant.
 Nos. 86-2099, 86-2100.
 United States Court of Appeals,
First Circuit.
 Heard Oct. 7, 1987.
Decided Dec. 2, 1987.
 
 Ruben Nazario with whom Martinez, Odell, Calabria & Sierra, Hato Rey, P.R., was on brief, for Conservit, Inc.
 Philip E. Roberts, Hato Rey, P.R., with whom Harry A. Ezratty, San Juan, P.R., was on brief, for plaintiff, appellee in no. 86-2100, and on brief pro se in no. 86-2099.
 Before BOWNES, Circuit Judge, TIMBERS,* Senior Circuit Judge, and BREYER, Circuit Judge.
 BOWNES, Circuit Judge.
 
 
 1
 These are two separate but related appeals. No. 86-2100 concerns an alleged breach of fiduciary duty in contravention of the provisions of a court-approved settlement agreement. Defendant contests special jury verdicts on the bases of res judicata and the erroneous exclusion of evidence at trial. In No. 86-2099, the attorneys for plaintiff Joseph Catullo seek reversal of the denial of attorney's fees by the district court. Analysis requires a detailed exposition of the facts leading to the dispute.
 
 I. Background
 
 2
 Early in 1983, plaintiff Joseph Catullo approached defendant Conservit, Inc., a Maryland corporation, and proposed that the latter join Catullo in an ongoing scrap metal crushing operation in Puerto Rico. Conservit previously had operated a similar venture in Puerto Rico and readily agreed to join Catullo as part of a corporate entity doing business as the Barlof Salvage Company, Inc. (Barlof). The parties entered into an agreement which provided in pertinent part that Conservit would contribute both machinery and operating funds and that Catullo would contribute his labor and expertise. The parties each received a 50% share in Barlof with profits to be divided equally. In addition, the agreement provided that Conservit would receive a payment of $3.00 for every ton of metal crushed by Barlof until the cost of the machinery provided was repaid.
 
 
 3
 Catullo operated Barlof from August until December of 1983. At that time, Conservit decided to open an alternate crushing operation in Puerto Rico, citing as its reason the mismanagement of Barlof by Catullo. Catullo immediately filed suit in district court, alleging, inter alia, usurpation of corporate opportunity. Conservit filed a separate action against Catullo for breach of contract. Extensive discovery followed. The court consolidated the cases and appointed a receiver. On August 17, 1984, the parties entered into a voluntary settlement.
 
 
 4
 The settlement agreement was never reduced to a signed writing. The parties met in chambers with the district judge who approved the terms and dismissed the case with prejudice. The settlement agreement, as reflected by the oral recitation of the parties on the record, provided the following: (1) Conservit would manage Barlof; (2) Conservit owned the machinery which it had shipped to Puerto Rico pursuant to the original agreement and would transfer title to Barlof upon the completion of installment payments; (3) the revenues of Barlof would be divided in half, with 50% applied to pay past expenses in the ratio of each party's expenditures and 50% divided equally between the parties as profit; and (4) each party maintained a 50% share in Barlof with a buy-out option. The settlement agreement also provided for the payment of legal fees to both sides as an expense of Barlof. The record does not reflect any discussion at the in-chambers settlement conference of the continued operation by Conservit of a competing scrap metal crushing business.
 
 
 5
 Eight months after the district court approved the settlement agreement, Catullo filed the instant suit alleging harm both individually and as a representative of Barlof. Catullo named Conservit, Sidney Metzner (the executive officer of Conservit), and Barlof itself as defendants. The complaint set forth two counts, both grounded on breach of fiduciary duty. Count One alleged that Conservit had overpaid itself for certain expenditures and underpaid Catullo for prior expenses and profits due under the settlement agreement. Count Two alleged that Conservit had usurped various corporate opportunities rightfully belonging to Barlof. Defendants' answer stated, inter alia, that (1) res judicata barred the usurpation claim by virtue of the prior settlement and dismissal with prejudice, and (2) plaintiff had received all monies due under the agreement, and that in any event, the only existing claim lay in a suit for execution of the judgment. Defendants filed a motion for partial summary judgment which the court denied. A jury trial ensued.
 
 
 6
 At the conclusion of the trial, the jury returned five special verdicts. These verdicts assessed damages against Conservit on behalf of both Catullo and Barlof. The specific awards were as follows: (1) $15,000 to Catullo for prior expenses, (2) $42,000 to Catullo for improperly withheld corporate profits, (3) $29,373.25 to Barlof for an overpayment of attorney's fees, (4) $10,000 to Barlof for an overpayment of Conservit's prior expenses, and (5) $35,000 to Barlof for breach of fiduciary duty. The $15,000 award to Catullo for prior expenses was reduced at plaintiff's request to $12,000--the amount proven at trial. The court entered a final judgment on behalf of Catullo for $54,000, and on behalf of Barlof for $74,000. On appeal, Conservit contests three of the jury awards: the damage award of $35,000 for breach of fiduciary duty; the reimbursement of attorney's fees in the amount of $29,373.25; and the profits due under the agreement in the amount of $42,000. Plaintiff's attorneys have appealed the denial of fees for their work in the derivative suit.
 
 II. Res Judicata
 
 7
 Defendant argues that res judicata bars the present action. It contends that plaintiff's complaint merely advances a new legal theory as a guise to return to the same issues raised, settled, and dismissed with prejudice under the August 14, 1984 agreement. The gist of defendant's argument is that its present undertakings in Puerto Rico simply maintain, without extending, its independent operation on the island; that plaintiff had full knowledge of Conservit's competing scrap metal operation and of the continuing contracts held by the company; that the question of the ongoing nature of Conservit's competing enterprise did not enter into the settlement negotiations; and that the resulting agreement has a preclusive effect.
 
 
 8
 This court recently considered the preclusive effect of a settlement agreement in Oliveras v. Miranda-Lopo, 800 F.2d 3 (1st Cir.1986). The parties in Oliveras entered into a contract for the formation and operation of a computer service business. Five years after the creation of the company, one party filed suit, alleging, inter alia, failure to carry out corporate duties and unjust enrichment. One month after the initial filing, the litigants agreed to a settlement and moved to dismiss the action. Subsequent to the judgment of dismissal, the defendant in the first action filed suit for anticipatory breach of the settlement agreement. Defendants raised the bar of res judicata.
 
 
 9
 In Oliveras, we found that res judicata did not bar suit on the settlement agreement. Noting that local law applied, id. at 6, we looked to the statutory law of Puerto Rico. The Civil Code limits the presumption of res judicata to situations in which "between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, causes, and persons of the litigants...." P.R.Laws Ann. tit. 31, Sec. 3343 (1968). Comparing the federal suit with the preceding action in state court, we found that the two cases presented different causes of action. Applying the test of Mercado Riera v. Mercado Riera, 100 P.R.R. 939, 950 (1972) (quotingMillan v. Caribe Motors Corp., 83 P.R.R. 474, 487 (1961)), which inquires into whether the two suits require different evidence, we found it clear that the cause of action for breach of the settlement agreement would require "entirely different evidence" than the suit on the original contract, 800 F.2d at 6, and hence that the first judgment did not preclude the subsequent action.
 
 
 10
 Oliveras controls the case at bar. Plaintiff's suit for breach of the settlement agreement alleges a new cause of action which could not have been brought in the previous suit. Cf. Lovely v. Laliberte, 498 F.2d 1261, 1263 (1st Cir.) ("res judicata ... bars all grounds that might have been, but were not, presented to the state court."), cert. denied, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). A claim of corporate mismanagement requires new evidence--both of the terms of the agreement and of the post-settlement conduct constituting the violation. Absent perfect identity between the causes, res judicata poses no bar.
 
 
 11
 Defendant further alleges that the trial court erred in rejecting Conservit's claim that plaintiff's sole remedy lay in an execution of the previous judgment under Federal Rule of Civil Procedure 69(a). We considered, and rejected, a similar claim in Oliveras: "Although it may have been preferable for the parties to return to the Puerto Rico Superior Court, there can be no doubt that the district court has diversity jurisdiction over the cause of action and the parties." 800 F.2d at 8. Accord 15A C.J.S. Compromise & Settlement Sec. 48 (1967) ("A compromise agreement may be enforced by ... a separate proceeding thereon, or ... by petition or motion in the original action asking for such enforcement.") (footnotes omitted). It was not error to entertain plaintiff's suit on the settlement agreement.
 
 III. Exclusion of Evidence
 A. Corporate Mismanagement
 
 12
 Defendant contends that even if res judicata did not bar plaintiff's suit on the settlement agreement, the trial court erred in excluding testimony by Metzner concerning the terms of that agreement. The agreement as read into the record did not discuss in any detail the responsibilities of Conservit as manager of Barlof. More specifically, it did not reveal whether the parties contemplated a cessation of Conservit's competing scrap metal crushing operation. Despite the ambiguity of the terms of the settlement agreement, the district court excluded testimony concerning the settlement negotiations. When counsel asked Metzner on direct examination what transpired during settlement talks, the court sustained an objection. The court subsequently heard the evidence during an offer of proof. On appeal, defendant argues that the exclusion of evidence constitutes reversible error. We agree.
 
 
 13
 The parties dispute the basis for the exclusion of Metzner's testimony. Plaintiff's counsel originally objected on the grounds of parol evidence and subsequently invoked Federal Rule of Evidence 408. After reading the record, we believe that the court ruled on the basis of Rule 408. On either ground, however, the exclusion was error.
 
 
 14
 Rule 408 provides in pertinent part as follows:
 
 
 15
 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.... This rule ... does not require exclusion when the evidence is offered for another purpose....
 
 
 16
 Id. (emphasis added). The purpose behind Rule 408 is the promotion of "nonlitigious solutions to disputes." Reichenbach v. Smith, 528 F.2d 1072, 1074 (5th Cir.1976). The rule protects parties to a settlement negotiation from adverse consequences when the negotiations fail; admissions made during the course of the negotiations may not be introduced as evidence of liability on the underlying claim--such admissions may, however, be introduced for other purposes. As pointed out by the Advisory Committee on the Federal Rules of Evidence, the rule has limited application to completed settlements which fully resolve the dispute and preclude future claims arising out of the same transaction.
 
 
 17
 The situation at bar does not fall within the ambit of Rule 408. Defendant sought to introduce testimony concerning the various subjects discussed during the negotiations to establish the intent of the parties to the agreement so as to rebut the allegation of corporate mismanagement. In the offer of proof, Metzner asserted that the parties considered and assented to Conservit's dual role as a manager of Barlof and owner of a competing concern.[1] Defendant argues that this testimony was not offered to disprove liability for the original claim settled in the first suit, but rather to prove the terms of the agreement itself. Thus the admission of the testimony would in no manner contravene the public policy favoring compromise. Rather such admission is crucial to a judicious enforcement of the agreement: "Where the settlement negotiations and terms explain and are a part of another dispute they must often be admitted if the trier is to understand the case." 2 J. Weinstein & M. Berger, Weinstein's Evidence p 408, at 408-32 to -33 (1986) (footnote omitted); see also Cates v. Morgan Portable Building Corp., 780 F.2d 683, 691 (7th Cir.1985) ("Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.") (citing Central Soya Co. v. Epstein Fisheries, 676 F.2d 939, 944 (7th Cir.1982)). The exclusion of this testimony under Rule 408 was reversible error and necessitates a remand for a new trial on the question of breach of fiduciary duty.
 
 
 18
 The parol evidence rule does not bar consideration of the terms of the settlement agreement. In deciding the applicability of the parol evidence rule, this court must look to state law. See 35A C.J.S. Federal Civil Procedure Sec. 458 (1960); Vanston v. Connecticut General Life Insurance Co., 482 F.2d 337, 340 n. 1 (5th Cir.1973). The Puerto Rico Rules of Evidence exclude extrinsic evidence concerning the terms of an agreement only when the agreement, whether written or oral, is clear and unambiguous. P.R.Laws Ann. tit. 32, App. IV R. 69(B) (1983).[2] When the document leaves doubt as to the intention of the parties, the court must look beyond the literal terms. In Hiers of Ramirez v. Superior Court, 81 P.R.R. 347 (1959), the court held: "The only terms which can be catalogued as clear are those which in themselves are lucid enough to be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation, and without necessitating for their understanding any reasoning or illustration susceptible to challenge." Id. at 351 (citation omitted). See also P.R.Laws Ann. tit. 31, Sec. 3471 (1968) (literal sense of contract observed only where terms of contract are clear). In the instant case, the settlement agreement is silent on the question of Conservit's operation of a competing business. This silence creates doubt as to the intention of the parties and requires resort to extrinsic evidence.[3]
 
 
 19
 The Puerto Rico Civil Code addresses the determination of intention: "In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R.Laws Ann. tit. 31, Sec. 3472 (1968); accord Francisco Garraton v. Lanman & Kemp-Barclay & Co., 559 F.Supp. 405, 407-08 (D.P.R.1983) ("In matters of contract interpretation the Civil Code, as well as Puerto Rico's equivalent parol evidence rule ... permit resort to extraneous circumstances surrounding the document being interpreted when there appears to be conflict on the written context.") (citing Merle v. West Bend Co., 97 P.R.R. 392, 399 (1969)). This applies to Metzner's testimony. The offer of proof discusses the parties' contemporaneous knowledge both of Conservit's past operation of its own scrap metal crushing enterprise and its intention to continue operations. Presettlement discovery had revealed the existence of continuing contracts between Conservit and other parties involving prospective purchases of approximately 11,000 tons of metal to be crushed by Conservit's independent operation. This evidence was probative of the litigants' intentions and should not have been excluded under the parol evidence rule.
 
 B. Attorney's Fees
 
 20
 Defendant further alleges error in the exclusion of testimony concerning the provisions for attorney's fees. While the settlement agreement expressly provides for attorney's fees to be paid out of the profits of Barlof, the exact terms of the arrangement are subject to dispute. Plaintiff contends that the agreement set a cap on attorney's fees for both sides. Defendant argues that the language merely set a time frame in which certain minimal payments were to be paid, with the difference forthcoming according to the revenue flow of Barlof. The court admitted testimony by Catullo concerning the disputed cap on attorney's fees while excluding defendant's evidence. The exclusion of defendant's evidence constitutes reversible error and requires a new trial on the question of attorney's fees.
 
 
 21
 During the oral recitation of the settlement agreement, the following exchange took place:
 
 
 22
 Mr. Roberts: There is a legal fee of $14,000 payable to [plaintiff's counsel]. It will be $7,000 when the receiver gives over the account to Mr. Metzer on behalf of Conservit and the other $7,000 will be paid within 90 days to be guaranteed by Conservit....
 
 
 23
 Mr. Odell: I think it should be mentioned insofar as the legal fees are concerned that where you mentioned the $7,000 will be paid initially to [plaintiff's counsel] as soon as the accounts--the checking account is handed over to Mr. Metzner, that an equal amount will be paid--
 
 
 24
 Mr. Roberts: I am sorry. An equal amount will be paid, $7,000 will be paid to the law firm of Colorado--
 
 
 25
 Mr. Ezratty: No, to Conservit.
 
 
 26
 Mr. Roberts: Oh, they are going to pay the 7,000 in legal fees back to Conservit and Conservit also has the right, within the next 90 days, to give the other $7,000.
 
 
 27
 Catullo testified, without objection, that the above colloquoy reflected an agreement to set a cap of $14,000 apiece on the fees for the attorneys. Defendant argues that in fact the discussion merely summarized an arrangement under which plaintiff's counsel would receive a specific amount ($14,000) within a specific time period (90 days) to be guaranteed by Conservit, and defendant's counsel would receive an equal amount within that period--without reference to any ceiling on total fees charged to Barlof. Defendant offered two kinds of evidence to support this interpretation: testimony by Metzner concerning the parties' intentions and testimony by defense counsel concerning the meaning of a draft supplemental agreement. The court sustained objections to both lines of testimony.
 
 
 28
 The analysis of the exclusion of Metzner's testimony concerning corporate mismanagement and usurpation of corporate opportunity applies with equal force to the exclusion of his testimony on attorney's fees. The court's sweeping exclusion of all testimony concerning the content of the settlement negotiations finds no support in either Rule 408 or the Puerto Rican law on parol evidence. The discussion of attorney's fees did not even approach the model of clarity envisioned by the exclusionary rule of P.R. Laws Ann. tit. 32, App. IV Rule 69. Given the ambiguity of the settlement agreement, which the court repeatedly criticized as deficient, extrinsic evidence concerning the intent of the parties should have been admitted.
 
 
 29
 The second kind of excluded evidence involved testimony by Luis Moreda, an attorney in the firm representing defendant, concerning a proposed settlement agreement between the parties which was to follow the actual court judgment. The proposal, which was never effectuated, read in pertinent part:
 
 
 30
 Bar/Lof shall pay forthwith to [plaintiff's counsel] the sum of seven thousand dollars towards his legal fees on behalf of Bar/Lof and Bar/Lof shall pay forthwith an equal sum to Conservit towards its legal fees. On or before ninety days from date herein Bar/Lof shall pay to [plaintiff's counsel] a further sum of seven thousand dollars and in full and final payment of his legal fees in the total amount of fourteen thousand dollars. Bar/Lof shall also pay to Conservit an equal sum in such period. [Emphasis added].
 
 
 31
 Defense counsel sought to solicit testimony from Moreda concerning the different language used in reference to Catullo and Conservit. Defendant argues that whereas $14,000 satisfied all of plaintiff's legal fees, no such maximum satisfied, or was meant to satisfy, the costs of defense counsel. In sustaining the objection to Moreda's testimony, the court ruled that the document--standing alone--was very clear, stating that it refused to engage in "a game of words." This was error for two reasons. First, the proposal at issue presented a mere draft, not a binding contract. See P.R.Laws Ann. tit. 31, Sec. 3371 (1968) ("A contract exists from the moment one or more persons consent to bind himself or themselves....") (emphasis added). Second, even if the proposal were construed as a contract, the language lends itself to either meaning advanced by the litigants and hence does not fall within the proscription of the Civil Code which requires strict application of the literal terms only when those terms are so clear as to "leave no doubt as to the intentions of the contracting parties." P.R.Laws Ann. tit. 31, Sec. 3471 (1968). The exclusion of this evidence prejudiced defendant.
 
 IV. Undistributed Profits
 
 32
 The improper exclusion of evidence affected only that portion of the judgment awarding $64,373.25 to Barlof for (1) breach of fiduciary duty and (2) wrongful reimbursement of attorney's fees. Defendant also alleges error in the $42,000 award to Catullo for undistributed corporate profits on two grounds. First, Conservit argues that the district court improperly denied its motion to amend the judgment. Conservit claims that the settlement agreement imposed an obligation upon Barlof alone to distribute corporate profits and that no grounds exist for attaching liability to Conservit. Second, defendant argues that even if this court affirms the judgment below, it must nonetheless order remittitur given the insufficiency of the evidence. While we find defendant's first argument without merit, we do find that the amount of the award exceeded its evidentiary bases and we remand for entry of remittitur.
 
 A. Defendant's Motion to Amend the Judgment
 
 33
 Federal Rule of Civil Procedure 59 allows the court to alter or amend a judgment after its entry upon motion by either party. In this case, Conservit filed a timely motion which the district court denied. On appeal, our review is limited to a determination of whether the trial court committed a manifest abuse of discretion. See 6A J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 59.15 (2d ed. 1987). See also Walker v. Bank of America National Trust & Savings Association, 268 F.2d 16, 25 (9th Cir.), cert. denied, 361 U.S. 903, 80 S.Ct. 211, 4 L.Ed.2d 158 (1959).
 
 
 34
 Defendant alleges an abuse of discretion in the imposition of liability upon a corporate officer. Conservit cites Title Fourteen of the Puerto Rico Civil Code for the proposition that officers enjoy immunity from suit: "No suit shall be brought against any officer, director or stockholder for any debt or liability of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation...." P.R.Laws Ann. tit. 14, Sec. 2202(b) (1976). Defendant misconstrues the nature of the cause of action. Plaintiff's suit for corporate profits centered on a charge of breach of fiduciary duty. Catullo claimed that the refusal to distribute profits as required by the settlement agreement constituted a breach of Conservit's duties as trustee. Rather than alleging responsibility for a "debt or liability of a corporation," the plaintiff charged Conservit with direct liability for breach of trust. See generally Restatement (Second) of Trusts Secs. 201, 205 (1959). As manager of Barlof, Conservit owed "a high degree of diligence and good faith" and could incur liability for a "failure to perform, or breach of, official duties." 19 C.J.S. Corporations Sec. 764(2) (1940). The trier of fact could have found the failure to distribute profits under the settlement agreement to be a tortious breach of duty sufficient to confer liability. Cf. Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 907 (1st Cir.1980) (under Puerto Rico law director may be liable for corporate tort in which he actively participates); Fleming v. Toa Alta Development Corp., 96 P.R.R. 234, 238 (1968) (corporate directors may be individually liable where business managed for the purpose of defrauding a creditor). In light of Puerto Rican law on fiduciary duty, we find no error in the denial of the motion to amend.
 
 B. Remittitur
 
 35
 Federal law sets the standard for granting of remittitur in a diversity case. See Donovan v. Penn Shipping Co., 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977). Rule 59 empowers the trial court to order remittitur where a damage award is not supported by the weight of the evidence. See 6A J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 59.08, at 59-193 (2d ed. 1987). On appeal, our review is limited to the question of whether the court below abused its discretion. See K-B Trucking Co. v. Riss International Corp., 763 F.2d 1148, 1162 (10th Cir.1985) (citations omitted); Carlton v. H.C. Price Co., 640 F.2d 573, 578 (5th Cir.1981) (citation and footnote omitted); Moore's Federal Practice p 59.08, at 59-211.
 
 
 36
 Our reading of the record does not find evidence sufficient to support the $42,000 award for undistributed corporate profits. Under the settlement agreement, the revenues of Barlof were to be allocated in the following manner: (1) $10,000 to be set aside as a minimum balance and (2) the remainder to be divided equally between profits and expenses. Conservit then was to distribute the profits equally between itself and Catullo. Conservit also was to reimburse both parties for prior expenses. Applying this formula to the facts, Barlof's revenues amounted to $230,755. This figure includes (1) $192,755 for the 19,298 tons of scrap crushed by Barlof from the time of the settlement onward, and (2) $38,000 which existed in the Barlof account at the time Conservit took over from the receiver. Defendant argues that from this sum the jury had to deduct (1) $28,000 in attorney's fees, (2) $72,504 in disbursements to Conservit to pay off the equipment initially provided, and (3) $6,000 distributed equally between Conservit and Catullo under the terms of the agreement. These costs total $106,504. Defendant's interpretation contradicts the plain language of the agreement. Reading the evidence in the light most favorable to the plaintiff, the settlement agreement provides for the revenues of Barlof to be divided into two equal parts: profits and expenses. The costs enumerated by defendant comprise a portion of the expenses of Barlof--not the profits.[4] Under the terms of the agreement, plaintiff could properly claim no more than $31,188.75 in undistributed profits. That sum is arrived at as follows:
 
 
 37
 The final figure of $31,188.75 constitutes the maximum amount of damages supported by the evidence. The difference between the actual award ($42,000) and the figure quoted above has no legal basis. See Matador Drilling Co. v. Post, 662 F.2d 1190, 1197 (5th Cir.1981) (court determines whether jury verdict "exceeds the maximum amount recoverable under the applicable contract provisions").
 
 
 38
 Accordingly, we remand the case with directions that the trial court enter an order for remittitur in the amount of $10,811.25 or for a new trial on the issue of damages for undistributed corporate profits.
 
 V. Denial of Attorney's Fees
 
 39
 The sole issue on appeal in No. 86-2099 involves plaintiff's motion for attorney's fees. The judgment below awarded Barlof a total of $74,000. That figure included $35,000 in damages for unfair competition and usurpation of corporate opportunity, $29,373.25 for an overpayment of Conservit's attorney's fees, and $10,000 for overpayments of Conservit's prior expenses. While we have reversed and remanded the first two awards on the basis of the improper exclusion of evidence, the $10,000 award for overpayment of expenses remains unchallenged. Plaintiff argues that the money recovered by Barlof through the device of a shareholder derivative suit constitutes a common fund which benefits all the shareholders of Barlof. Hence, plaintiff contends, attorney's fees should be assessed against the fund to avoid burdening the plaintiff and unjustly enriching the only other shareholder--Conservit. The court below denied plaintiff's motion without an opinion. We affirm.
 
 
 40
 The general rule concerning attorney's fees is that such fees ordinarily are not recoverable as costs. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970). An exception to the so-called American rule exists for cases in which a plaintiff successfully maintains an action which benefits both the plaintiff and a group of others in a like manner. Id. at 392, 90 S.Ct. at 625. This principle, known as the common fund doctrine, prevents the unjust enrichment of persons who benefit from a lawsuit without shouldering its costs. See Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). The litigant may recover fees from the fund and thus spread the burden among the entire class of persons benefitted.
 
 
 41
 In diversity cases, state law generally governs the question of attorney's fees. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975). In the instant case, however, the applicable Puerto Rican statute on stockholder derivative suits makes no provision for the award of attorney's fees. See P.R. Laws Ann. tit. 14, Sec. 2203 (1976). Since Title Fourteen of the Puerto Rico Civil Code is based largely on the corporation law of Delaware, we must look for guidance to the Delaware Code. See Simcox v. San Juan Shipyard, 754 F.2d 430, 443 (1st Cir.1985); Commonwealth Oil Refining Co. v. Houdry Process Corp., 185 F.Supp. 485, 489 (D.P.R.1960). Delaware commits the award of attorney's fees to the discretion of the trial court. See CM & M Group v. Carroll, 453 A.2d 788, 795 (Del.1982); Chrysler Corp. v. Dann, 223 A.2d 384, 389 (Del.1966). Our review of the decision below, therefore, is limited by the abuse of discretion standard.
 
 
 42
 The common fund exception to the American rule has been interpreted narrowly by the Delaware courts. See CM & M Group, 453 A.2d at 795 ("Delaware courts have been very cautious in granting exceptions to the rule.") (citation omitted). The courts have emphasized that the award of fees under the common fund doctrine presupposes a large class of beneficiaries who do not participate in the litigation. See Kahan v. Rosenstiel, 424 F.2d 161, 165-66 (3d Cir.) ("[I]t would be unjust to require one party to bear the entire expense which necessarily results in a benefit to a large class of persons.") (emphasis added), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). The purpose of assessing fees against the common fund is to spread the cost among those who profit, see 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 54-78, at 54-493, and not to impose greater liability upon the losing party. See 13 C. Van Swearingen, Fletcher Cyclopedia of the Law of Private Corporations Sec. 6045 (1984).
 
 
 43
 This concern with imposing costs on the losing party, in contravention of the American rule, has led courts to scrutinize the award of fees to determine the actual effect of the judgment. In Junker v. Crory, 650 F.2d 1349 (5th Cir.1981), the Fifth Circuit reversed an award of attorney's fees which followed a successful derivative action. While the plaintiff sued the officers and directors for breach of fiduciary duties on behalf of the corporation, the court found that no common fund was created. Warning that "attorneys' fees are not recoverable in a derivative action if the effect of such an award is to shift the liability for those fees to the defendant," 650 F.2d at 1363 (footnote omitted), the court noted that the only other possible beneficiaries were the other shareholders--the defendants in the derivative action. We find it instructive to quote from the Junker opinion:
 
 
 44
 The trial court's judgment on the derivative claim in this case creates no common fund benefiting the remaining former ... shareholders other than [plaintiff]. Rather, the other shareholders are cast in judgment in the corporation's favor. Therefore, the effect of the award of attorney's fees out of the so-called derivative recovery is to increase the defendants' liability to include the plaintiff's attorney's fees. The award of attorney's fees to the plaintiff who successfully litigates the corporation's claim is not designed "to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them and that would have had to pay them had it brought the suit."
 
 
 45
 Id. (quoting Mills v. Electric Auto-Lite Co., 396 U.S. at 396-97, 90 S.Ct. at 627-28). Accord Bailey v. Meister Brau, Inc., 535 F.2d 982, 995 (7th Cir.1976) (reversed award of fees to successful shareholders against the losing party); Ramey v. Cincinatti Enquirer, 508 F.2d 1188, 1199 (6th Cir.1974) (same), cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975).
 
 
 46
 An award of attorney's fees in the present action would effect the very evil which Junker identifies. Plaintiff is the sole shareholder to benefit from the derivative action. The only other party in interest, Conservit, must advance the money which plaintiff now proclaims to be a common fund. The facts simply do not support plaintiff's allegation that a denial of fees will create a windfall for nonparty shareholders in Barlof.
 
 
 47
 Plaintiff also contends that the rationale of Junker must be limited to its facts. The argument is that in Junker the corporation on behalf of which plaintiff brought suit had ceased to exist, thus the corporation itself derived no tangible benefit from the suit. In the present suit, plaintiff continues, Barlof remains a viable entity which has profited from plaintiff's vigilance. We find this argument unpersuasive. The message of Junker is that an expansion of the common fund doctrine threatens to unlawfully encroach upon the American rule. See Alyseska Pipeline, 421 U.S. at 269, 95 S.Ct. at 1627 ("courts are not free to fashion drastic new rules with respect to the allowance of attorney's fees to the prevailing party"). Recently, the Supreme Court considered the possibility of shifting fees to the losing party. In Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), several holders of convertible debentures brought a class action against the issuing company alleging violations of federal and state securities laws. The district court held for the class and assessed attorney's fees against the corporation. Boeing appealed the award of fees, claiming that since it held an interest in any unclaimed portion of the judgment, the assessment of fees amounted to a violation of the American rule. The Court rejected Boeing's argument, but only after finding that Boeing held no present interest in the fund. Id. at 481, 100 S.Ct. at 750. The Court stated:
 
 
 48
 Boeing presently has no interest in any part of the fund.... Any right that Boeing may establish to the return of money eventually unclaimed is contingent on the failure of absentee class members to exercise their present rights of possession. Although Boeing itself cannot be obliged to pay fees awarded to the class lawyers, its latent claim against unclaimed money in the judgment fund may not defeat each class member's equitable obligation to share the expenses of litigation.
 
 
 49
 Id. at 481-82, 100 S.Ct. at 751 (footnotes omitted).
 
 
 50
 Conversely, Conservit does have a present interest in the monies awarded to Barlof. In fact, the defendant has a 50% share in the award and assessing fees against that sum effectively would burden the losing party. While we do not hold that a common fund can never exist in a situation where the plaintiff and defendant each hold 50% of the shares of a corporation, cf. Jones v. Uris Sales Co., 373 F.2d 644, 648-49 (2d Cir.1967) (modified assessment of attorney's fees to lie against corporation rather than 50% shareholder), we find no abuse of discretion in the district court's denial of attorney's fees.
 
 VI. Summary
 
 51
 Our holding in this case is fourfold: (1) the damage award for breach of fiduciary duty is vacated and the case remanded for a new trial on the grounds of improper exclusion of evidence, (2) the order to reimburse attorney's fees is likewise vacated and remanded, (3) the award of undistributed corporate profits is remanded with directions to the trial court to enter an order for remittitur or a new trial, and (4) the denial of attorney's fees for plaintiff's counsel is affirmed.
 
 
 52
 SO ORDERED.
 
 
 
 *
 Of the Second Circuit, sitting by designation
 
 
 [1]
 Metzner stated:
 It was specifically discussed that Conservit was already operating a flattening operation and that it was agreed among the parties at Conservit to also be operating the Bar/Lof flattening operation. [sic] That was discussed. It was found to be no problem and it was known to all the parties that Conservit would operate Bar/Lof's crushing operation and Conservit's crushing operation.
 
 
 [2]
 The statute reads in pertinent part:
 When in an oral or written agreement, either public or private, all the terms and conditions constituting the true and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties, or successors in interest, no evidence extrinsic to the contents of the same....
 
 
 [3]
 The district court explicitly noted the difficulties which the ambiguity of the agreement posed for the trier of fact:
 There is nothing in the settlement agreement, as I told the jury before, that precludes in black and white Conservit from competing. There is nothing in this agreement that says that.
 So, the jury will have to determine that as part of their fact-finding process and what is the consequences, if there are consequences, to such acts.
 
 
 [4]
 The third figure cited by defendant ($6,000) represents profit which was distributed at the time of the settlement under the terms of the agreement. The $3,000 per party distribution constitutes a portion of the $24,000 in previously distributed profits subtracted from the final amount due
 
 
 [1]
 Total Revenues of Barlof[5]-- $230,755.00
 2. Minus $10,000 Minimum Balance-- $220,755.00
 3. Divided 50/50 (Profits/Expenses)-- $110,377.50
 4. Divided 50/50 Between the
 Parties-- $ 55,188.75
 5. Minus $24,000 Previously
 Distributed Profits-- $ 31,188.75
 
 
 [5]
 Plaintiff claims that the total revenues should read $240,755 to include the $10,000 jury award to Barlof for overpayments to Conservit of the latter's expenses. However, the return of $10,000 will merely increase the residue in that portion of the revenues earmarked for expenses; it will not increase the total revenue